**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **JOHARIE WALKER AND KEYWANE BALTIMORE, JR., individually and as the legal guardians of minor K.B.** | * | **CIVIL ACTION NO. 25-2428** |
| | * | **JUDGE ELDON E. FALLON** |
| **VERSUS** | * | **MAGISTRATE JUDGE KAREN WELLS ROBY** |
| **REGINA COELI CHILD DEVELOPMENT CENTER** | * | |
| *   *   *   *   *   *   *   * | | |

## ORDER & REASONS

Before the Court is a motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure filed by Defendant Regina Coeli Child Development Center ("RCCDC"). R. Doc. 10. Plaintiffs Joharie Walker and Keywane Baltimore, Jr., individually and as the natural tutors and/or next friends of K.B. ("Plaintiffs") opposed the motion. R. Doc. 15. RCCDC replied. R. Doc. 16. Considering the record, briefing, and applicable law, the Court now rules as follows.

### I.      BACKGROUND

This case arises out of the alleged exclusion of an autistic child from full-time enrollment at a childcare facility because of his disability. R. Doc. 8. According to the amended complaint, at the time of the alleged discrimination, K.B. was a three-year-old diagnosed with autism spectrum disorder ("ASD"), a qualified disability under the relevant federal laws. *Id.* at 2.  K.B. attended his first day at Pearl River Head Start ("Head Start") on August 22, 2025, seemingly without Head Start being on notice of K.B.'s ASD diagnosis. *See id.* at 2–3.

Three days later, on August 25, 2025, Plaintiffs Walker and Baltimore submitted a medical form completed by one of K.B.'s medical providers, which stated that K.B. has "autism spectrum." *Id.* About a month later, at RCCDC's request, Walker submitted to Defendant a "Confidential

Psychological Examination" confirming K.B.'s ASD and recommending that K.B. receive accommodations and additional services, such as one-on-one instruction and scheduled breaks, as well as less specific comments, such as the statement that K.B. would benefit from a language-rich environment. *Id.* at 4. The form did not recommend that K.B. only attend Head Start part time, nor did the form indicate that K.B. was a threat to himself or others. *Id.* Nonetheless, after receipt of the evaluation, Plaintiffs allege that Defendant began to treat K.B. differently than it had before receipt of the evaluation. *Id.*

Specifically, Plaintiffs assert that RCCDC began asking Walker and Baltimore to pick K.B. up early "for ordinary issues typical of a 3-year-old, such as standing on a table or not sleeping through nap time." *Id.* at 4–5. Then, five days after receipt of the evaluation, Head Start's "Director of Center Compliance" asked Walker and Baltimore for a sit-down meeting, during which she told them that K.B. would, from that point on, only be permitted to be at Head Start for a maximum of two hours per day. *Id.* at 5. This decision, Plaintiffs press, was animated by RCCDC's discrimination against K.B. because of his ASD. *Id.* at 5–6. After the meeting, Walker e-mailed the director that her "son [was] being excluded from full time participation . . . on account of his disability" and "request[ed] that, within seven days, [RCCDC] permit him to attend Pearl River Head Start on a full time basis." *Id.* at 6. Head Start did not change its decision. *Id.*

Plaintiffs now bring claims against RCCDC on K.B.'s behalf for violations of Title III of the Americans with Disabilities Act ("ADA"), Section 504 the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.* ("RA"), and the Louisiana Commission on Human Rights, La. R.S. § 51:2247 ("LCHR"). *Id.* at 10–19. Plaintiffs Walker and Baltimore also assert claims under all three laws in their own right under a theory of associational discrimination. *Id.* Plaintiffs seek injunctive relief pursuant to the ADA, RA, and LCHR; compensatory and actual damages pursuant to the RA and

2

LCHR; attorneys' fees and costs pursuant to the ADA, RA, and LCHR; and interest and other remedies allowed by law. *Id.* at 19–21.

## II.    PENDING MOTION

RCCDC now asks this Court for a partial dismissal of Plaintiffs' claims—specifically, the parents' individual claims. R. Doc. 10. RCCDC takes the position that the first amended complaint does not contain sufficient allegations to plausibly establish that the parents have standing to bring associational discrimination claims under the ADA. 10-1 at 7–18. Its overall argument is that "Plaintiffs must show that they themselves suffered exclusion from RCCDC's [Head Start] Program, denial of benefits under the Program, or were personally discriminated against in obtaining services or benefits of the Program due to their association with K.B." and that they have failed to do so because they assert "allegations of mere derivative injuries" which are not the kinds of particularized injuries that can establish standing for an ADA associational discrimination claim. *Id.* at 10. Defendant avers that Walker and Baltimore have no independent, personal right to the benefits and services provided by Head Start, and that all their injuries are derived solely from RCCDC's alleged discrimination against and failure to accommodate K.B. in its Head Start program. *Id.* at 14. And because the parents do not have associational standing under the ADA, Plaintiffs' RA and LCHR claims based on associational discrimination must also fail. *Id.* at 25–18.

Plaintiffs oppose the motion. R. Doc. 15. Overall, they argue that the parents have stated cognizable claims for associational discrimination because RCCDC failed to provide them with services equal to those which Defendant provided to the parents of nondisabled Head Start attendees. *Id.* They press that Head Start is the kind of "program that serves the entire family, including the parents," and that they suffered particularized injuries when RCCDC treated them differently than it treated other parents because they have a disabled son. *Id.* at 5. For example,

Plaintiffs contend that "[o]ne of the 'services' RCCDC offers is for parents to drop off and pick up their children from [Head Start] at certain times of day." *Id.* at 4. Thus, by only allowing K.B. to attend for two hours a day, RCCDC did not provide Plaintiffs with the service of all-day childcare, and they deprived them of this service only after receiving the psychological examination. *Id.* And because RCCDC denied Walker and Baltimore this service that it provided other parents, Walker and Baltimore directly suffered independent and particularized injuries, such as missed shifts and lost jobs. *Id.* at 2–4. The foregoing, Plaintiffs assert, demonstrates Walker and Baltimore's standing to bring an associational discrimination claim because they were plainly excluded from and denied equal services received by other parents on account of their association with K.B. *Id.* at 5–6.

RCCDC replied. R. Doc. 16. It reasserted its position that Walker and Baltimore's injuries are entirely derivative because they would not have suffered these injuries if they were not K.B.'s parents. *Id.* Defendant also reiterated its points about two cases and noted its concerns about the imposition of limiting principals as to what kinds of injuries can form the basis of standing in cases like this. *Id.*

### III.    LEGAL STANDARD

Motions filed pursuant to Federal Rule of Civil Procedure 12(b)(1) allow a party to seek dismissal of a complaint based on "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). For a Rule 12(b)(1) motion to dismiss, the burden of proof is on the party asserting jurisdiction. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). "When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Id.* When examining a Rule 12(b)(1) motion, the district court may consider matters of fact that may be in dispute. *Id.* (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)). "Ultimately, a motion to dismiss for lack

of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." *Id.* (citing *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.,* 143 F.3d 1006, 1010 (5th Cir. 1998)).

Federal Rule of Civil Procedure 12(b)(6) provides that an action may be dismissed "for failure to state a claim upon which relief can be granted." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2008)). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 556. A claim is plausible on its face when the plaintiff has pleaded facts that allow the court to "draw a reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 570. Although a court must liberally construe the complaint in light most favorable to the plaintiff, accept the plaintiff's allegations as true, and draw all reasonable inferences in favor of the plaintiff, *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996), courts "do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Arias-Benn v. State Farm Fire & Cas. Co.*, 495 F.3d 228, 230 (5th Cir. 2007) (quoting *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005)).

## IV.   DISCUSSION

Defendant asks the Court to dismiss the parents' associational discrimination claims because RCCDC did not directly harm the parents because their injuries are wholly derivative from K.B.'s alleged deprivation of equal goods and services, not any denial of goods and services owed by RCCDC to Walker and Baltimore. Plaintiffs press that RCCDC directly—not derivatively—injured them by depriving them of equal access to full-time childcare services, which Defendant afforded to the parents of nondisabled Head Start attendees. For the following reasons, the Court

finds that Plaintiffs have alleged sufficient facts at the motion to dismiss stage to state a plausible claim for associational discrimination.

### A. Associational Standing Under Title III of the ADA

The section of the ADA that confers standing on a non-disabled parties, such as Walker and Baltimore, states that "[i]t shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." 42 U.S.C. § 12182(b)(1)(E). On its face, Title III of the ADA permits associational standing, but it "recognizes only certain kinds of injuries that may form the basis of an ADA suit brought by a non-disabled individual" by "mak[ing] clear that a non-disabled individual has standing to bring suit under the ADA only if [they were] personally discriminated against or denied some benefit because of [their] association with a disabled person."[1] *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1142 (11th Cir. 2014).

To date, the Fifth Circuit has not explicitly endorsed a cause of action for discrimination based on association with a disabled person under Titles I, II, or III of the ADA. *E.g.*, *Besser v. Texas Gen. Land Office*, 834 F. App'x 876, 886 (5th Cir. 2020) (noting this and reciting the elements that would apply if a published opinion endorsed a theory of associational discrimination

---

[1]     This standard derives in large part from Chief Judge Jacobs' dissent-in-part in *Loeffler v. Staten Island University Hospital*, 582 F.3d 268 (2d Cir. 2009), which was later made the majority rule in the Eleventh Circuit in *McCullum v. Orlando Regional Healthcare System, Inc.*, 768 F.3d 1135 (11th Cir. 2014). The circuit split concerns the scope of associational discrimination under both the ADA and the RA; some circuits, like the Eleventh under *McCullum*, use this "narrow" interpretation of associational standing for both the ADA and the RA that requires nondisabled parties to allege that they were personally discriminated against in order to establish standing. *McCullum*, 768 F.3d at 1142–44 (discussing and declining to follow the majority in *Loeffler*). Conversely, the Second Circuit in *Loeffler v. Staten Island University Hospital* held that the scope of permissible associational discrimination claims under the RA sweeps more broadly than the scope under the ADA, allowing plaintiffs injured under the RA to bring claims if they can show an independent injury that was causally related to the denial of services to the disabled party. 582 F.3d at 279. Many cases that go into depth of associational standing under the ADA discuss the split that applies to associational standing under the RA. *Cf. Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010) (citing *Delano-Pyle v. Victoria Cnty, Tex.*, 302 F.3d 567, 574 (5th Cir. 2002)) ("The RA and the ADA are judged under the same legal standards, and the same remedies are available under both Acts.").

under Title I). However, numerous courts in this circuit have addressed associational standing and have generally found that "[w]hile the exact standards or tests may vary from circuit to circuit, the recognition of associational standing under the ADA is widespread and supported by the statutory text." *Harmony Behav. Health Servs., LLC v. Kent*, 750 F. Supp. 3d 665, 690 (M.D. La. 2024) (collecting cases that found associational discrimination cases actionable under Titles I, II, and III of the ADA across the federal circuits).

When determining if a claimant has standing to bring an associational discrimination claim, courts in this circuit routinely require non-disabled parties to allege that they are personally excluded, personally denied benefits, or personally discriminated against because of their association with a disabled person—not that they simply suffered a derivative injury related only to the disabled person's alleged denial or exclusion. *E.g.*, *Harmony*, 750 F. Supp. 3d 665, 690–92 (finding the plaintiff pleaded sufficient facts to establish associational standing under the ADA and the RA); *Brown v. McLane Child.'s Scott & White Hospital & Clinic*, No. 19-45, 2019 WL 13253791, at *6–7 (W.D. Tex. May 8, 2019) (finding the nondisabled plaintiff did not sufficiently plead that he personally was excluded or denied benefits); *J.D. v. Georgetown Indep. Sch. Dist.*, No. 19-45, 2011 WL 2971284, at *10 (W.D. Tex. July 21, 2011) ("Because [the plaintiff] has not pled any denial of a benefit or service that he himself suffered, his claims fail.").

Here, Defendant submits that Walker and Baltimore have only alleged that they suffered indirect injuries derivative of and wholly related to K.B.'s discrimination, not direct injuries resulting from RCCDC's direct denial of equal goods and services to them. R. Doc. 10. Plaintiffs take the position that "[w]hen a parent enrolls their young child in a full-day program, they are not simply seeking an education for their child." R. Doc. 15 at 5. Instead, programs like Head Start "by design, . . . serve[] the entire family, including the parents," and not just the enrolled children.

*Id.* For example, parents "are also obtaining, for themselves, the ability to work a full day" and are themselves "the direct recipients of the program's services and the benefits of said program." *Id.*

The Court finds that the allegations in the complaint, which are taken as true at this stage, support Plaintiffs' arguments; thus, at the motion to dismiss stage, Walker and Baltimore have alleged associational standing under the ADA. The first amended complaint details that RCCDC denied K.B. the ability to attend Head Start full time by placing him on a daily attendance maximum time of two hours—a schedule that Head Start did not impose upon the parents of its nondisabled attendees. R. Doc. 8 at 4–7. And in imposing this reduced schedule, RCCDC told Walker and Baltimore that they needed to adhere to this modification or Head Start would not permit K.B. to attend at all. *Id.* at 5. As a result, Walker and Baltimore were forced to sacrifice time and income to pick up K.B. early from the Head Start facility. *Id.* at 8–10. Parents of other nondisabled Head Start attendees were not placed in the same position. *Id.* Said plainly, RCCDC denied Walker and Baltimore equal benefits and equal services to those received by other parents.

Under Title III of the ADA, actors like RCCDC have an affirmative duty to provide equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to individuals like Walker and Baltimore who are associated with a disabled child. 42 U.S.C. § 12182(b)(1)(E). When RCCDC limited K.B.'s attendance to two hours per day, it denied K.B. equal access to Head Start's academic and other child-centered services. Similarly, but distinctly, when RCCDC limited K.B.'s attendance to two hours per day, it denied Walker and Baltimore of equal access to Head Start's service of, *inter alia*, full-time childcare—a service directed at and received by the parents of nondisabled children. Walker and Baltimore have plausibly alleged enough facts to suggest that they would not be receiving cabined services if they were the parents of a nondisabled child. And they have detailed particularized, concrete injuries flowing from

RCCDC's choice to flout its affirmative duty to provide Walker and Baltimore the same services it provided to other parents who are not associated with a disabled child. This is enough to establish associational standing under these specific allegations.

### 1. Distinguishing Cases

Given this finding, it is important to distinguish the instant case from certain prominent cases or case types. First, there are several cases where nondisabled plaintiffs have been forced to interpret medical terminology when their deaf loved ones are hospitalized because the hospital failed to provide, in accordance with the ADA, a sign language interpreter. For example, in *Bernius v. Ochsner Medical Center-North Shore, L.L.C.*,[2] a section of this district found that the non-hearing-impaired plaintiff did not have associational standing when she was forced to interpret for her hearing-impaired mother while her mother was a patient at Ochsner. No. 16-14730, 2016 WL 10586188, at *6–7 (E.D. La. Dec. 15, 2016). There, the court found that the nondisabled plaintiff needed to "allege that she was personally excluded, denied benefits, or discriminated against because of her association with [her hearing-impaired mother]," but she failed to do so. *Id.* at *7. In so finding, it observed that "the extent of [the nondisabled plaintiff's] alleged injury is that she was forced into a professional role as interpreter for [her mother] because Ochsner failed to provide an interpreter." *Id.*

Though that is the extent of the court's factual reasoning, it is clear that the court recognized the nondisabled plaintiff's injuries as entirely derivative of Ochsner's failure to provide her mother with an interpreter. Ochsner did not alter any direct relationship it held with the nondisabled plaintiff because the nondisabled plaintiff was not a patient at Ochsner or otherwise in a position

---

[2] Though the claims were brought under the RA and not the ADA, the court adopted the ADA's standards for associational discrimination when assessing the contours of associational standing under the RA. *Bernius*, 2016 WL 10586188, at *6–7.

to be receiving direct services from Ochsner. *Cf. McCullum*, 768 F.3d at 1145; *Durand v. Fairview Health Servs.*, 902 F.3d 836, 843–45 (8th Cir. 2018) (finding no associational standing under either the broader *Loeffler* or the narrower *McCullum* standards when nondisabled plaintiff acted as an interpreter for her deaf parents during hospitalization); *Estate of Dennis Bookshnis v. Yuma Reg. Med. Ctr.*, No. 22-34, 2022 WL 23036604, at *5 (D. Ariz. Aug. 4, 2022) ("[The nondisabled plaintiff] was not a patient at [the facility] nor did she have a right to an interpreter as a nondisabled individual. . . . [She] was not 'personally excluded, personally denied benefits, or personally discriminated against' by the [facility] because of her association with her [hearing impaired] father."). In those kinds of cases, courts observe that the hospitals are not denying equal goods and services to the nondisabled companion of the patient because the hospital is not providing them with a direct service. Said differently, the nondisabled companion is not a recipient of the interpreter services provided by the hospital in a way that would cause them to fall within the scope of having associational standing. Here, Walker and Baltimore have pleaded enough to show that they received a direct service from RCCDC and that RCCDC denied them the full benefits of their provided service because they are associated with K.B.

Second, Defendant points the Court to *Brown v. McLane Children's Scott and White Hospital and Clinic*, a case that also found that a nondisabled plaintiff assisting a deaf, hospitalized loved one did not adequately plead that they were excluded, denied benefits to, or discriminated against because of their association with a disabled person. No. 19-45, 2019 WL 13253791, at *3– 7. That court was particularly "concerned that if it were to allow the claims that [the nondisabled plaintiff] seeks to assert, then there would be no limiting principal in terms of what damages might be sought" in these kinds of cases. *Id.* at *5. In pondering, it posited questions such as "What about the cost of traveling to the hospital? What about the cost of the babysitter who had to take care of

10

his other children while he was at the hospital?" *Id.* at \*5. But in that case, and unlike in this case, the Court observed that the nondisabled plaintiff was not receiving a direct service from the hospital, and "allowing non-disabled individuals to bring claims under the [RA and ADA] without themselves having been denied services is inconsistent with congressional intent to limit associational standing to the persons who are themselves excluded or denied." *Id.* Here, the Court has explicitly found that Plaintiffs plausibly alleged that they are the direct recipient of services from RCCDC that are separate and distinct from the services received by their child. *Brown* is thus distinguishable.

Defendants also cite *Glass v. Hillsboro School District* for the proposition that "[t]he court found the parents failed to allege a separate and distinct denial of services, apart from their role as parents of the children who were enrolled in the defendant's program." R. Doc. 16 at 6. In that case, the parents of a disabled child sued the child's school, premising their associational discrimination claim on the school having denied the parents the right to have their own hired education experts observe the defendant's special education classrooms. 142 F. Supp. 2d 1286, 1291–92 (D. Or. 2001). There, the court found that the parents did not allege any separate and distinct denial of services "apart from their role as parents of children enrolled or proposed to be enrolled in defendant's programs." *Id.* at 1292. It found that "the plaintiff parents' allegations . . . show that their attempt to gain access for their experts to the special education classroom related solely to their children's education, and was not an attempt to exercise some independent and separate right to have access to the classroom for their own benefit." *Id.* It also noted that "the plaintiff parents do not allege that parents of non-disabled children were provided unrestricted access for their experts to observe the special education classrooms; it may reasonably be assumed

11

that any parent likely would have run into the same requirements of which the plaintiff parents now complain." *Id.*

The instant case is distinguishable from the facts and pleading in *Glass*. First, the parents in *Glass* did not plead that they were denied a service that the school provided to other parents. Walker and Baltimore have pleaded that other parents received the benefit of full time childcare, among other services, from RCCDC. Second, the court found that the parents' injury—the denial of access to the special education classroom—did not in any way relate to a school service directed at the parents. Here, the Court has found that Walker and Baltimore pleaded that RCCDC, for example, "treated [them] less favorably than other parents" because it "did not require [the other parents] to pick up their children early." R. Doc. 8 at 10. Thus, here, taking Plaintiffs' allegations as true and viewing them in a light most favorable to Plaintiffs, they have identified a separate service rendered by RCCDC to parents and explained how they were denied equal services because of their association with K.B.

Overall, the Court finds the present case most analogous to *S.K. v. North Allegheny School District* and *C.H. ex rel. J.H. v. Henry County School District*, two cases where courts found that nondisabled plaintiffs had associational standing. 146 F. Supp. 3d 700 (W.D. Penn. 2015); No. 24-2707, 2025 WL 964040 (N.D. Ga. Mar. 31, 2025). In both of those cases, school districts denied disabled children modifications in their public transportation programs. *S.K.*, 146 F. Supp. 3d at 717–18; *C.H.*, 2025 WL 964040, at *7. Those courts found that the parents plausibly alleged that they were denied a benefit by the school because of their child's disability. *S.K.*, 146 F. Supp. 3d at 718; *C.H.*, 2025 WL 964040, at *7. The court in *C.H.* noted that "[t]he complaint alleges that, as a result [of the school's accommodation denial], [the nondisabled parent] was forced to drive C.H. to and from school at personal expense" and that "[t]hat is, for now, a sufficient showing that

[the nondisabled parent] was denied a benefit because of her association with C.H." *C.H.*, 2025 WL 964040, at *7. That court continued: "If the District wishes to more squarely contest whether transportation services for C.H. are properly considered a 'benefit' to [the nondisabled parent], it may do so at summary judgment." *Id.*

### B. Associational Standing Under the RA

The Fifth Circuit has not yet defined the scope of associational discrimination under Section 504 of the RA, and circuits are split "about the type of injury a non-disabled Rehabilitation Act claimant must experience." *Bernius*, 2016 WL 10586188, at *3–5 (explaining the circuit split and following *McCullum*). Section 504 itself provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program . . . ." 29 U.S.C. § 794(a). Its enforcement provision, however, extends the right to sue under Section 504 to "any person aggrieved by any act or failure to act by any recipient of Federal assistance . . . ." *Id.* at § 794a(a)(2). "Thus, § 504's enforcement provision does not limit relief to 'qualified individual[s] with a disability'" and "[e]ven the narrowest constructions of this [enforcement] language to be endorsed by courts leave non-disabled individuals with room to bring associational discrimination claims in certain circumstances." *Arce v. Louisiana*, 306 F. Supp. 3d 897, 921–22 (E.D. La. 2017), *as amended*, No. 16-14003, 2017 WL 5619376 (E.D. La. Nov. 21, 2017).

Though "[a]ssociational standing is recognized under both" the ADA and the RA, as demonstrated by the RA's language, "only the ADA sets forth a clear statutory definition." *Bernius*, 2016 WL 10586188, at *4. The circuits are split as to whether to adopt the ADA's scope of associational standing in the RA context or some other standard. *Id.* at 4–5 (explaining the more

13

lenient *Loeffler* majority opinion standard followed by the Second Circuit and the narrower standard of the *Loeffler* dissent and *McMullum* majority opinion standard followed by the Eleventh Circuit). This Court agrees with the analysis in *Bernius* and adopts the Eleventh Circuit's narrower standard, which requires nondisabled plaintiffs asserting RA claims to allege—like they would in bringing an ADA claim—that they were personally excluded, personally denied benefits, or personally discriminated against because of their association with a disabled person. *Id.* at *5 (adopting the *McCullum* standard and finding that the nondisabled plaintiff did plead sufficient facts to meet the standard).

Because the Court has found that Walker and Baltimore have sufficiently alleged an ADA associational discrimination under this same standard, the Court likewise finds that they have successfully pleaded an associational discrimination claim under Section 504 of the RA.

### C.  Associational Discrimination Under the LCHR

The LCHR makes it "a discriminatory practice for a person to deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation, resort, or amusement," on the grounds of disability. La. R.S. § 51:2247. It allows "[a]ny person deeming himself injured by an alleged violation . . . shall have a civil cause of action." *Id.* at § 51:2264. "Place of public accommodation" is defined in the LCHR as "any place, store, or other establishment . . . which supplies goods or services to the general public or which solicits or accepts the patronage or trade of the general public." *Id.* at § 51:2232(9). Defendant does not argue that it is not a place of public accommodation as defined in the LCHR.

Like the plain text of Title III of the ADA, the LCHR provides that "[a]ny person deeming himself injured" may bring a claim under the act. *Compare* La. R.S. § 51:2264 (quoted in text) *with* 42 U.S.C. § 12188 ("The remedies and procedures . . . of this title are the remedies and

14

procedures this subchapter provides to *any such person* who is being subjected to discrimination on the basis of disability in violation of this subchapter . . . ." (emphasis added)). Defendant advances no argument as to why the statute should be interpreted differently. RCCDC does, however, note that courts in Louisiana—like courts interpreting ADA and RA associational discrimination claims under the *McCullum* standard—forbid recovery for derivative damages, such as loss of consortium, for damages sustained by persons other than the direct victim of the alleged discrimination. R. Doc. 10-1 at 18 (citing *Labouliere v. Our Lady of the Lake Found.*, No. 16-785, 2017 WL 4365989, at *7 (M.D. La. Sept. 29, 2017)).

This Court, however, has found that Walker and Baltimore have adequately pleaded that their injuries are not simply derivative of the discrimination faced by K.B. Because Defendant advances no other argument as to why Walker and Baltimore's LCHR claims should be dismissed for lack of standing beyond the derivative-injuries argument, the Court declines to dismiss their LCHR claims for lack of standing at the motion to dismiss stage. This is reasonable conclusion given that the LCHR is "modeled after the ADA." *Conine v. Universal Oil Prod. Co.*, No. 42,409 (La. App. 2 Cir. 9/26/07), 966 So. 2d 763, 767; *see also Smith v. France*, 850 F. App'x 243, 248–49 (5th Cir. 2021) ("[T]he Louisiana Human Rights Act references federal antidiscrimination law in its statement of purpose. Both section 51:2247 and ADA Title III ban discrimination by places of public accommodation, and so it is reasonable to look to Title III for guidance."). Walker and Baltimore's LCHR claims, therefore, survive.

V.    **CONCLUSION**

Considering the foregoing,

15

**IT IS ORDERED** that Defendant's motion to dismiss, R. Doc. 10, is hereby **DENIED**.

New Orleans, Louisiana, this 15th day of April, 2026.

THE HONORABLE ELDON E. FALLON